Thank you. Good afternoon, Your Honors. Mr. Bond, Ms. Blumenicke. May it please the Court, as you know, my name is Mark Flessner. I am a partner at Appalachian Night, and I'm appearing on behalf of Mr. Solomon. We've reserved two minutes, I think, for our rebuttal. We are appealing Mr. Solomon's sentence on two bases. First, that the District Court improperly calculated the benefit or the loss calculation under 2B1.1, and secondly, that the way in which Judge Chang sentenced the defendants created an unwarranted disparity between the defendants who were similarly situated. The District Court improperly increased Mr. Solomon's base offense figure by 16 levels, based on a factual finding that was simply against the manifest weight of the evidence. That is, that... Mr. Flessner, let me just put it this way. When I read in your brief at pages 21 and 22, there's just no evidence to support this, treating the 2013 $20 million contract as part of the case. I thought, gee, that's terrible. Then I looked at the District Judge's written explanation, where he goes through in considerable detail the circumstantial evidence that he relied upon. And I don't see that addressed by you until your reply brief. My question is, why shouldn't we treat that issue as waived, given the failure to engage with the evidence the District Court relied upon? Well, and I think this is brought out in the government's brief as well, that I think, with all due respect to my former colleagues at the U.S. Attorney's Office, that they relied on evidence and said that it supported the inclusion of the $20 million contract, when in fact it didn't. That's not my point. That wasn't the question. My question was, why did you save all of that debate for your reply brief when the District Judge laid out his thinking both orally and in writing on the question about the evidence he relied upon? Well, we were addressing the government's brief. That's why we put it in the government's brief. No, you weren't. I'm talking about your blue brief. No, I understand. And your blue brief, that's your chance to say the $20.5 million contract didn't belong there, and the reasons A, B, C, D, and E that the District Court judge gave for including it are not well-founded. Right. And you had everything you needed to attack his reasons. He laid them out, as Judge Hamilton said, both in his we have it in the transcript and we have it in his additional written statement. So why didn't you? The reasons sound quite rational to me, by the way, but you didn't really delve into them. I think we were trying not to make the government's argument for it, and I think the government really did play a little. You made the government's argument for it by trying to convince us that the judge was wrong to look at the $20.5. You've got to engage with what the district judge relied upon. It's not what the government did. It's what the judge did. We rebutted those arguments before Judge Chang, and some of the evidence that he claimed to rely on, like the e-mails, simply don't support the argument. Well, that's a matter of how you read the e-mails, for sure, and how you look at the timing and how you look at the context of the e-mails and the kinds of things the district judge is looking at. Obviously, it's circumstantial evidence. She doesn't send an e-mail saying, oh, good, now we have the $20.5 million contract. The real direct evidence in this is the testimony of Barbara Bird Bennett, and she testified in the grand jury that the $20 million contract was not part of the scheme. She never expected to get any kickback from the $20 million contract, and her only expectation, and that is what Mr. Varonis pled to in his plea agreement, that's what Mr. Solomon pled to in his plea agreement, was that it was the $500,000 for the $2 million contract. I understand, but the evidence then evolved as time went on and there was a pre-sentence report, and for whatever it's worth, by the time she gets to her own sentencing, she concedes that the two contracts are linked. I'm not relying on that necessarily, but I'm just giving it as an example that what she said at the grand jury was at an early stage of this proceeding and more happened. Well, that actually relates a little bit to the disparity argument as well, because with all due respect to Ms. Barbara Bird Bennett, she said a lot of things, particularly in her initial interview with the FBI. She lied 26 times, yet she got cooperation credit. She got the 5K letter. But, I mean, that, look, I have a lot of sympathy for your point that, you know, the fact that Mr. Solomon winds up with 84 months and she winds up with 54 may seem a little inside out. There's a long body of case law that says that the government is entitled to decide when to file these 5K motions and that the discount for co-op, I mean, she actually starts out with a higher guideline range too, that the government's allowed to reward cooperation that way. Maybe this is all a bad idea and we should go to Congress and the Supreme Court and everybody else and tell them not to do that. But right now, the law does permit that, and Mr. Solomon's sentence is a below-guideline sentence. All of the sentences were a below-guideline sentence. That's correct. So have we ever held that a below-guideline sentence was unduly harsh? We did not find case law on that. I've been looking for a few years, but I might have missed it. You didn't miss it either. I did not. And the other thing I would point out, I mean, one of the arguments that we see floating around in this case is what does disparity mean? Does it mean national? Does it mean whatever? Right. But the district judge here actually does look right down to the level of the co-defendants and, you know, he hasn't sentenced Bird-Bennett at the point he's sentencing Mr. Solomon, but this would not be the case to go to the mats on that one for because he actually does look at the immediate level. He does, and I acknowledge that. I think our point is that the level of disparity that he dropped 39 percent from the government's recommendation for Barbara Bird-Bennett, he only dropped 22 percent for Mr. Solomon. It basically eliminated the public corruption adjustment for her because she was so much lower for it. It makes no sense. It sort of rewrites the guidelines in that regard. Well, unless there's a significant difference in terms of their cooperation. What did Solomon do to cooperate? He proffered for 15 hours in four different sessions. When? I'm sorry? When in the process? Both he and Varonis came in at the same time. Barbara Bird was talking prior to that, although, again, she had lied during her initial proffers and during her initial FBI interview without counsel. So there is no, if the question is, is it a matter of someone came in first and made the case, that is not what happened. I think the government acknowledges that everyone basically came in at the same time. What this case really is about is ultimate fairness. I mean, Mr. Solomon was not the public official in this case. And do we have some meta-awareness that the public official is always more culpable? There is a specific adjustment under the guidelines for being a public official, and she received it, but that the decrease eviscerated that adjustment. I take it you wouldn't be satisfied if her sentence were raised? I'm sorry? You don't just want her to have gotten a more severe sentence? That really wouldn't? That's not, I'm obviously not. Not the direction you want to go in. Judge Rovner, did you want to ask? I'm sorry, Judge Rovner. I'm not as kind as Mr. Flessner. She received a gift. Well, I'm not going to argue with that. Wise. Very wise. If you want to save it a little bit for rebuttal, I'll be happy to. Yes, I'm going to save it two minutes. Thank you very much. Mr. Bond. May it please the Court. Good afternoon, Your Honors. Aaron Bond on behalf of the United States. Your Honors, the District Court correctly calculated the loss amount in this case based on the evidence which showed a standing agreement for Barbara Bird Bennett to throw CPS business and contracts to defendants' companies, collectively the Supes entities, on a continuing basis in return for money and a lucrative position with defendant and Supes at the conclusion of her time with CPS. In its ruling. With regard to the emails that were deleted in response to the Inspector General investigation, were any of those deleted emails related to the $20.5 million contract or at least emails sent between Solomon, Bird, Bennett, and Varanus around the time of the $20.5 million contract? Your Honor, the record is unclear as to whether any of those emails that were deleted specifically referenced the $20.5 million. In addition, the plea agreements, none of the plea agreements specified that either. What the District Court relied on was the circumstantial evidence that, in addition to the emails that were deleted throughout the course of the investigation, the emails that were continuing to be deleted and the emails that occurred towards the end of the case or towards the end of the June 2013 contract, I think taking all those emails into context allowed the District Court to make the determination based on the totality of the circumstances. You didn't actually recover the deleted emails. You just knew that emails had been deleted. Is that right? That's correct, Your Honor. Is there any evidence of payment deposited into the development fund around the time of the $20.5 million contract? I'm not sure if there's specific evidence as to that specific time. What the evidence showed was that, with regard to the development fund, the payments into that fund started occurring on a continual basis from approximately the fall of 2012 through the spring of 2014 and that during that time the defendant, as well as Mr. Varanis, set aside anywhere from 4% to 9% of all incoming payments that they were receiving that were being made to Supes at this time. And that included the payments on the 2013 contract? That would correct. The time frame would include the time period in June of 2013, Your Honors. In addition, with regard to that development fund, that money specifically was accrued in anticipation of paying Ms. Bird-Bennett, in this case, a bribe in the form of a signing bonus after she left CPS and returned to Supes. Additionally, what circumstantially ties that June 2013 contract to the standing agreement here is a big point is made about the fact that the October 2012 contract was supposed to be a 10% kickback, so to speak, for Ms. Bird-Bennett when she came back to Supes. So if you take spring of 2014, that development fund was flush with approximately $586,000. $254,000 of that would have been earmarked for that October 2012 contract. That leaves approximately $332,000 in the development fund for a handsome salary and a signing bonus for Ms. Bird-Bennett's continued efforts on behalf of defendant, including her help in obtaining that June of 2013 contract. Mr. Bond, I have to say when I looked at this, the loss calculation actually looked fairly conservative to me, given the $20 million contract and the profits that were expected to accrue from that. Can you explain to me the basis for the loss calculation from the government's point of view? Yes, Your Honor. The loss calculation was determined based off of the profits that were received by Supes from CPS. So the way, again. So not the total contract, but you subtracted out the payments that were going for the amounts of money going for some value? Correct. The way the value was determined was that money that was specifically brought into Supes by CPS totaled approximately, I believe, $2.9 million. That was how the loss was determined. But they provided services for the Chicago public schools. They did these training programs and they did stuff. So it wasn't just straight gain to Bird-Bennett or others. Is this in relation to the? I'm asking about that. It was my understanding that actually part of the argument for more favorable treatment was that Supes was, in fact, providing useful services for the Chicago public schools. They were, Your Honor. However, I think what the district court correctly determined was that what that argument boils down to is that what the defendant was trying to do was to guarantee a promise from Bird-Bennett to kick these contracts and kick these payments towards him. While CPS may have been inclined to sign those contracts with Supes, getting Bird-Bennett on board with defendant guaranteed those contracts. So let me just see if I understand this right. The $2.9 million figure was actual cash that changed hands that you estimate was profits to Supes. Correct. Distributed among the three defendants. Two defendants. Sorry, but Bird-Bennett and then Solomon and Varonis got some, right? Mr. Varonis and the defendant received the money. Ms. Bird-Bennett was given a promise of future payment. Okay. But there was no calculation based on the intended profits that were never ultimately gained? That is correct. It was only the profits that were actually money that was received into Supes' bank accounts, the percentage, whatever the percentage was that was received from CPS. That's the part that struck me as conservative. That's the calculation that was made, though. Could you summarize for us, Mr. Bond, from your perspective, the differences in the different defendants' cooperation that underlay the decisions about 5K1 and recommendations? Yes, Your Honor. With regard to the disparity in this case, I think the district court considered that disparity and spent a long time thinking about that and coming to its conclusion. What was determined here is in this case, Ms. Bird-Bennett successfully cooperated. The defendant did not. She qualified for the 5K reduction based on her cooperation. I understand that's what's on the surface here, but I'd like to understand what's behind it. She provided information regarding her own criminal conduct, the conduct of her co-defendants. She acknowledged previous lies to investigators. There's no question, and we don't mince no words, that she did come in and lie initially when she proffered. But she came back and owned up to that and provided valuable information and made up for the initial lies that she provided to investigators. She also participated in numerous proffers with the government, and she testified in front of the grand jury in June of 2015. Did she agree to testify against Varonis and Solomon if needed? Yes. The defendant, on the other hand, he did attempt to cooperate. We do acknowledge that. However, it was unsuccessful. He came in on four occasions to proffer. It did not work. He did not fully admit his responsibility. He minimized his conduct. He alleged criminal conduct for others that was not supported by the evidence that the government had. Moreover, I think what else the district court took into consideration, aside from the main disparity issue regarding the 5K reduction, was that it was the defendant who actually financially profited in this case. And by that I mean it was the defendant who was receiving the actual funds from CPS into his bank account, into the Supes Entity's bank account, whereas it was Mr. Bennett who had all she had was future promises of a substantial payment, to be sure. But that's all she had were future promises in addition to free meals, tickets to bowls and baseball, either soccer, Cubs games, and a plane ticket. But nothing substantive like the hardcore money that Mr. Solomon had, Your Honors. If there's any more questions, I would just rest and say that we'd ask you to confirm the district court's decision. Thank you. All right. Thank you very much. Anything further, Mr. Flessner? Yes, Your Honor. Just a couple of things. I think the answer to the question about the e-mails regarding the $20 million contract is that there's nothing in the record to demonstrate that any e-mails related to the $20 million contract. I think that's significant. Secondly, with respect to the services that Judge Wood, you asked, just looking on the Internet, you'll see how Supes was praised by what they were doing with the public school system, that Deputy Mayor Andy Zopp just went on and on in the Tribune about what great services they were providing to the Chicago Board of Education. With respect to you, I think the government is a bit unkind when it characterizes Mr. Solomon's cooperation compared to Barbara Bird Bennett. He, in 15 hours of proffering, admitted to everything, including his own participation in the scheme. That is a – I mean, I've proffered on many people, and 15 hours is a long time of proffering. So to say that she somehow did something significantly more than he did, this isn't a matter of the prosecutor likes one personality over another. It's a matter about what were they doing to assist in the investigation, and they assisted equally in the investigation. For that reason, we ask you to remand in having re-sentence. Thank you. All right. Thank you very much. Thanks to both counsel. We will take the case under advisement, and the court will be in recess.